**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTROLUX CONSUMER PRODUCTS, INC., <br><br>        *Plaintiff*, <br><br>    v. <br><br> IAM NATIONAL PENSION FUND, <br><br>        *Defendant*. | Civil Action No. 24-2296 (RDM) |

**MEMORANDUM OPINION**

Under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.*, an employer that decides to withdraw from a multiemployer pension plan must pay the plan an amount sufficient to cover that employer's share of unfunded vested benefits, if any. This amount—referred to as the employer's "withdrawal liability"—represents the withdrawing employer's share of "the difference between the present value of the plan's vested benefits and the present value of its assets." *Connors v. B & H Trucking Co.*, 871 F.2d 132, 133 (D.C. Cir. 1989); *see also* 29 U.S.C. § 1393(c). "[T]he assumptions and methods used in calculating withdrawal liability are" determined by pension plan actuaries, who "are trained professionals subject to regulatory standards" and who are not "vulnerable to suggestions of bias or its appearance." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 632 (1993). But because some of the critical assumptions—including, most notably, the appropriate discount rate—are both indeterminate and consequential, disputes often arise regarding the calculation of an employer's withdrawal liability.

When "a withdrawing employer wants to dispute a plan's calculations, it must do so through arbitration in the first instance," and may then, if warranted, challenge the arbitrator's award in litigation. *Emps.' Ret. Plan of the Nat'l Educ. Ass'n v. Clark Cnty. Educ. Ass'n*, 664 F. Supp. 3d 24, 28–29 (D.D.C. 2023) ("*Clark County I*").  The standard of review, however, is deferential—two times over.  To prevail before the arbitrator, the employer must prove by a preponderance of the evidence that "the actuarial assumptions and methods used in the determination were, in the aggregate, *unreasonable*," 29 U.S.C. § 1401(a)(3)(B)(i) (emphasis added), and then, to prevail in court, it must prove "by a *clear* preponderance of the evidence[] that the findings of fact made by the arbitrator were" incorrect, *id.* § 1401(c) (emphasis added).

Here, Plaintiff-Counter Defendant Electrolux Consumer Products, Inc. ("Electrolux") endeavors to clear these high hurdles.  In 2020, Electrolux withdrew from Defendant-Counter Plaintiff IAM National Pension Fund ("Fund"), and its withdrawal liability was assessed to be approximately $32 million based on a discount rate of 6%. Dkt. 1 at 2 (Compl. ¶ 2).  Electrolux unsuccessfully challenged that determination in arbitration and now challenges the arbitrator's findings of fact and conclusions of law before this Court.  *See id.*  Among other things, Electrolux argues that the Fund's Trustees, rather than its actuary, determined the relevant discount rate; that even if the actuary set the discount rate, the 6% rate did not represent his "best estimate" of the plan's "anticipated experience;" and that, in any event, the 6% rate was not sufficiently "similar" to the discount rate the plan used to calculate its minimum funding rate. Dkt. 16-1 at 12–14.  The Fund disagrees and seeks, in turn, to confirm the arbitrator's award. *See generally* Dkt. 17.

For the reasons explained below, the Court concludes that Electrolux has both failed to overcome the deference that Congress has required the courts to accord to reasonable actuarial

assumptions and arbitral findings of fact and failed to identify any legal error committed by the actuary or arbitrator. The Court, accordingly, will **DENY** Electrolux's motion for summary judgment, will **GRANT** the Fund's cross-motion for summary judgment, and will **CONFIRM** the arbitral award.

## I. BACKGROUND

### A.   Statutory Background

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, established a "comprehensive and reticulated" statutory structure to regulate private pension plans. *Nachman Corp. v. PBGC*, 446 U.S. 359, 361 (1980). Among its many provisions, the statute establishes unique rules governing multiemployer pension plans, like the plan at issue in this case. As the name suggests, a "multiemployer pension plan" is a plan in which "multiple employers make financial contributions to the same general trust fund, and the money in that fund is used to provide for the pensions of the various employers' employees." *Trs. of IAM Nat'l Pension Fund v. Ohio Magnetics, Inc.*, 656 F. Supp. 3d 112, 117 (D.D.C. 2023), *aff'd*, 92 F.4th 316 (D.C. Cir. 2024), *aff'd*, 146 S. Ct. 1224 (2026). "Like single employer plans, multiemployer plans [must] meet minimum funding standards, which require employers to contribute annually to the plan whatever is needed to ensure [that the plan] has enough assets to pay for the employees' vested pension benefits when they retire." *United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.*, 39 F.4th 730, 734 (D.C. Cir. 2022).

An employer that participates in a multiemployer plan is not bound to the plan forever, however; employers are free to withdraw from multiemployer pension plans and to end their obligations to make annual contributions. *See* 29 U.S.C. § 1383. But that prospect poses a problem, since withdrawal does not divest participants enrolled in the plan of the vested pension benefits that they have earned, and the plan's remaining contributors—that is, those employers

that continue to participate in the plan—must still fund the vested pension benefits of all the plan's participants. *See Energy W.*, 39 F.4th at 734–35 & n.2. Prior to enactment of the MPPAA, when a plan became "financially troubled, large contributions [were] needed to meet minimum funding standards, incentivizing employers to withdraw and precipitating a death spiral for the plan." *Id.* at 734. "Every employer withdrawal," in turn, "would shrink a plan's contribution base, forcing the remaining employers to make even larger contributions and increasing their incentive to withdraw." *Id.* at 734–35; *see also Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416–17 (1995). Although employers remained liable for their share of unfunded vested benefits if the plan terminated within five years of the employer's withdrawal, that incentive to continue to participate in troubled plans proved insufficient, *Energy W.*, 39 F.4th at 735, raising alarm bells that escalating employer withdrawals "could have resulted in the termination of numerous plans, forcing the [Pension Benefit Guaranty Corporation ("PBGC")] to assume obligations in excess of its capacity," *PBGC v. R. A. Gray & Co.*, 467 U.S. 717, 721 (1984). To make matters worse, the existence of the PBGC safety net, in practice, only further encouraged withdrawals and threatened to stretch the PBGC's obligations beyond its means. *See Connolly v. PBGC*, 475 U.S. 211, 214–15 (1986).

Congress enacted the MPPAA in 1980 to address this problem. To ensure that employers pay their fair share, to discourage strategic withdrawals, and to prevent pension plan insolvency, the MPPAA requires employers that withdraw from multiemployer plans to pay their "pro rata share of the pension plan's funding shortfall." *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 347 (7th Cir. 2012); *see also M & K Emp. Sols., LLC v. Trs. of the IAM Nat'l Pension Fund*, 146 S. Ct. 1224, 1228 (2026); 29 U.S.C. § 1381(a), (b). This amount—referred to as the employer's "withdrawal

4

liability"—is determined based on "the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *R. A. Gray & Co.*, 467 U.S. at 725 (quoting 29 U.S.C. §§ 1381, 1391); *see also* 29 U.S.C. § 1393(c). The plan's actuary is responsible for calculating the employer's withdrawal liability. *See Concrete Pipe*, 508 U.S. at 632.

Withdrawal liability is a function of both objective variables and indeterminate assumptions. *See Ohio Magnetics*, 656 F. Supp. 3d at 118; *see also M & K Emp. Sols.*, 146 S. Ct. at 1228 (function of "hard data" and "predictions about the future"). For instance, when calculating withdrawal liability, a plan's actuary knows how many employees are enrolled in the plan and what benefits their pensions provide; those variables are known and determinate. But the actuary must estimate, among other things, how long these employees will work and how long they will live. *Energy W.*, 39 F.4th at 735. The indeterminate assumption with the greatest effect on the withdrawal liability is the rate at which the plan's assets will grow "by the miracle of compound interest"—that is, the discount rate. *CPC Logistics*, 698 F.3d at 348. The higher the discount rate, the faster the plan's assets are projected to grow on their own, and thus the lower the funding shortfall and resulting withdrawal liability. *See id.* And, conversely, the lower the discount rate, the slower the assets are projected to grow, and thus the greater the funding shortfall and the larger amount the withdrawing employer must pay. *See id.*

When calculating withdrawal liability under the MPPAA, the plan actuary must use "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1). The "provisions governing the assumptions for" calculating withdrawal liability "are similar, but not

identical" to the assumptions governing a plan's minimum funding obligation. *Energy W.*, 39 F.4th at 741. Both require the actuary to use his "best estimate of anticipated experience under the plan," *id.* at 742 (quoting 29 U.S.C. §§ 1393(a)(1), 1084(c)(3)); both require the actuary to base his calculations "on the actual characteristics of the plan;" and both require the actuary to use a discount rate that "reflect[s] the interest the plan's assets are projected to earn." *Id.* "But it does not follow that the discount rates must be identical." *Id.* Rather, the D.C. Circuit has held that "there is an 'acceptable range'" and that "[n]othing in the statutory text indicates the assumptions for minimum funding and withdrawal liability must fall at the same point in the acceptable range of estimates based on the plan's characteristics." *Id.* (citation modified). "Because the discount rate assumptions for calculating withdrawal liability and minimum funding must be estimates of the same thing," however, "they will invariably be similar," and they should not diverge by large amounts. *Id.* (noting that a 500-basis-point divergence, for example, is unlikely to pass muster).

After calculating the withdrawal liability, the plan must notify the employer of the amount of its liability and the schedule for making payments.[1] 29 U.S.C. § 1399(b)(1). The employer may then "ask the plan sponsor to review any specific matter relating to the determination of [its] liability." *Id.* § 1399(b)(2)(A)(i). If a dispute remains between the employer and the plan sponsor concerning the amount of withdrawal liability due, "[e]ither party may initiate [an] arbitration proceeding." *Id.* § 1401(a)(1). The standard of review, however, is deferential. The arbitrator must presume that the actuary's determinations are "correct unless the

---

[1] Withdrawal liability is calculated "not as of the day of withdrawal, but as of the last day of the plan year preceding the year during which the employer withdrew," which is known as the measurement date. *Jos. Schlitz Brewing Co.*, 513 U.S. at 418; *see also M & K Emp. Sols.*, 146 S. Ct. at 1228.

6

party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." *Id.* § 1401(a)(3)(A).  To set aside the actuary's calculation of withdrawal liability, the arbitrator must find "by a preponderance of evidence that . . . the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or [that] the plan's actuary made a significant error in applying the actuarial assumptions or methods." *Id.* § 1401(a)(3)(B).  Finally, "[u]pon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action . . . in an appropriate United States district court . . . to enforce, vacate, or modify the arbitrator's award." *Id.* § 1401(b)(2).  In any such proceeding, the district court must apply "a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." *Id.* § 1401(c).

## B.    Factual and Procedural Background

The IAM National Pension Fund is a multiemployer pension plan that has provided benefits to members of the International Association of Machinists and Aerospace Workers and its local affiliates since 1960.  Dkt. 15-11 at 758.  Electrolux participated in and contributed to the Fund until June 27, 2020, when it permanently withdrew.  *Id.*  The Fund, in turn, sent Electrolux a notice and demand for withdrawal liability of approximately $32 million, payable (with interest) over a period of fifteen years.  *Id.* at 759.  The Fund's actuary, Cheiron, Inc., calculated Electrolux's withdrawal liability using a discount rate of 6%, which is the *withdrawal liability discount rate* that Cheiron had adopted in December 2018.  *Id.*  Had Cheiron, instead, used the 7.5% *minimum funding discount rate* in place at the time that Electrolux withdrew, the company's withdrawal liability would have been far less—only about $13 million.  *Id.*

**1.**

7

Much of the parties' present dispute centers on how and why Cheiron adopted the 6% withdrawal liability discount rate. At the relevant time, Cheiron's Chief Executive Officer, Gene Kalwarski, served as the Fund's enrolled actuary. *Id.* at 545, 760. "For several years prior to and through the 2020 plan year," Kalwarski used a discount rate of 7.5% for purposes of satisfying ERISA's minimum funding standards, *id.* at 760, "which require employers to contribute annually to the plan whatever is needed to ensure it has enough assets to pay for the employees' vested pension benefits when they retire," *Energy W.*, 39 F.4th at 734. The interest rate assumption that Kalwarski applied in calculating and reporting "the Fund's actuarial valuation [and, thus, minimum funding requirement] for 2016, 2017[,] and 2018 . . . was based on the [P]lan's characteristics and [the] anticipated experience of the [P]lan." Dkt. 15-11 at 760.

For years prior to 2017, a withdrawing employer would not have owed the Fund any "withdrawal liability because the Fund did not have [unfunded vested benefits ("UVBs")]." *Id.* As a result, "the discount rate for withdrawal liability was inconsequential" during that period—that is, nothing turned on whether the same (or different) actuarial assumptions applied to withdrawal liability and the minimum funding requirement. *Id.* That changed in 2017. In mid-2017, "Kalwarski advised the Trustees that the Fund had gone from being fully funded to having UVBs as of the end of the 2016 plan year" and that, going forward, "employers that withdrew from the Fund would owe withdrawal liability." *Id.* "In November 2017, Cheiron prepared an estimate of the cost to make a presentation to the Fund's Trustees on 'withdrawal liability policy,'" and the Trustees subsequently requested that Cheiron prepare the presentation. *Id.*; *see also* Dkt. 15-7 at 621.

On January 24, 2018, Cheiron made a PowerPoint presentation to the Board's Pension Working Group, following the Board meeting earlier that day. Dkt. 15-11 at 761. Accompanied

by his colleagues Chris Mietlicki and Patrick Nelson, Kalwarski led the discussion, *id.* at 541, while Mietlicki took notes, *id.* at 526.  Although Electrolux disputes the accuracy of their testimony, the witnesses at the arbitration represented that the purpose of the presentation "was to educate the Trustees as to the rationale for . . . Kalwarski's selection of a lower discount rate for withdrawal liability and his methodology for selecting the rate."  *Id.* at 761.  The PowerPoint presentation that Cheiron used at the meeting explained that the Plan's enrolled actuary—that is, Kalwarski—was responsible for determining the discount rate, albeit "[w]ith input from the Trustees."  Dkt 15-7 at 685.  Kalwarski testified that he informed the Trustees that it was his responsibility—and not theirs—to make the "actuarial judgment" regarding the appropriate discount rate to use, although he sought their "input."  Dkt. 15-11 at 568–70.  Mietlicki, in turn, corroborated that "the decision was made by" Kalwarski, and not by the Trustees.  *Id.* at 542–43.  Although Mietlicki agreed with Electrolux's counsel that a "consensus" was reached at the meeting, he resisted the suggestion that Kalwarski simply acceded to that "consensus."  *Id.* at 543.  Kalwarski, for his part, rejected the notion that a "consensus" was reached.  *Id.* at 569.

The PowerPoint presentation identified four notional "Options" for calculating withdrawal liability discount rates, including use of (1) the same rate used for minimum funding purposes; (2) a market-based rate, such as PBGC rates; (3) a blend of the market-based and minimum funding rates; and (4) the minimum funding rate less a fixed percentage.  Dkt. 15-11 at 761; *see also* Dkt. 15-7 at 672, 687.  The presentation then included a slide reflecting the Fund's UVBs as of January 1, 2017, under each of these notional methods.  Dkt. 15-7 at 688.  For purposes of illustrating the fourth option, the slide assumed that the discount rate would be set at 50 basis points below the minimum funding rate of 7.5% that was then in place.  *Id.*  Applying the minimum funding rate option, the UVBs amounted to about $1.3 billion, while the UVBs

9

rose to over $2 billion with the hypothetical 50-basis-point fixed adjustment. *Id.* Using the PBGC or blended rates resulted in UVBs many times higher. *See id.* At the arbitration hearing, Kalwarski explained that the PowerPoint presentation did not reflect his conclusions regarding the proper withdrawal payment discount rate but, rather, merely "show[ed] the sensitivity to various different discount rates, including the PBGC and the blended rates." Dkt. 15-11 at 566 ("no magic in 50 basis points").

Kalwarski further "testified that he informed the Trustees that he believed it was appropriate to select a discount rate for withdrawal liability purposes that was lower than the discount rate for funding purposes to account for the risks the withdrawing employer was avoiding." *Id.* at 761; *see also id.* at 568–69. He explained that "in the period around 2018 and 2019," his "best[]estimate" of the anticipated performance of the Fund was a "range," "somewhere between" 5.5% (or perhaps 5.25%) at "the bottom" and 7.75% at "the top." *Id.* at 550. Although Kalwarski did not document this range in any working papers, he testified that he based his calculations on, among other things, "the return expectations for the fund provided by its outside investment advisor" and the "investment return expectations of the investment advisor industry" using the Horizon Annual Survey of Investment Advisors. *Id.* at 548–49. He described his process as follows:

> Start with asking the investment consultant to provide four or five possible portfolios to the [T]rustees. And each portfolio would have an expected return and an annual standard volatility. We would have an aggressive portfolio, less aggressive, something in the middle, and then conservative.
>
> And with the investment consultant's expected return and annual volatility measure, we do a stochastic analysis of the portfolio, we present that to the [T]rustees, and they select the asset allocation risk profile that they're most comfortable with. And that begins the process of the return expectations for that allocation, and then we apply that allocation to the Horizon survey to see what comes out of that.

> So the [T]rustee risk preference at the beginning has an impact on where the range ultimately is.

*Id.* at 549.  At his deposition, Nelson confirmed that this was Kalwarski and Cheiron's typical practice.  *Id.* at 125–27.

For purposes of the minimum funding requirement, Kalwarski used a rate of 7.5%—a rate that was near, but not at, the top of the range—although he and his colleagues at Cheiron had told the Fund's Trustees "on multiple occasions" that they would "be dropping that discount rate to 7, [and] possibly lower, in the coming years," which, in fact, is what occurred in 2021.  *Id.* at 552, 555.  Kalwarski took a different view, however, with respect to the appropriate discount rate to use for purposes of calculating withdrawal liability starting in 2018, after the Fund had gone from being fully funded at the end of 2016 to having UVBs by mid-2017.  *Id.* at 760–63.  He still chose a discount rate within his best-estimate range, but he concluded that it was necessary to apply a "'risk premium' . . . to ensure that withdrawing employers were fairly charged for the costs associated with eliminating investment risk."[2]  *Id.* at 761–62.

Kalwarski further testified that he went into the January 24, 2018, meeting with the intention of selecting a risk premium of "no less than 50 basis points and no more than 150 basis points" below the 7.5% minimum funding discount rate.  *Id.* at 568; *see also id.* at 762.  The precise reduction required "a judgment call" based on factors such "as anticipated uncollectible withdrawal liability, bankruptcies, and the plan's underfunding."  *Id.* at 762.  Although

---

[2]  Kalwarski testified that this method of employing a "best-estimate" range was consistent with accepted actuarial practice, as established in Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board.  Dkt. 15-11 at 560–61.  The arbitrator understood his testimony to be describing the use of what the Actuarial Standards Board labels (and endorses) as "reasonable ranges," a term Kalwarski also used in his testimony, rather than the separate method of constructing best-estimate ranges that was rejected in 2013 revisions to ASOP 27.  *Id.* at 560, 762 & n.2.

11

Kalwarski testified that he arrived at the meeting with "a fair idea of where [he] wanted to be," he "wanted to have an open discussion with the [T]rustees to validate what [his] decision was going to be." *Id.* at 568–69.

Mietlicki's notes from the meeting refer to a risk premium of between 50 and 100 basis points and appear to indicate that Henry Eickelberg, the co-chair of the Board, advocated for a 100-basis-point reduction below the valuation rate. Dkt. 15-7 at 726; *see also* 15-11 at 527, 569. Although Mietlicki could not remember the specifics at the arbitration, he testified that his notes "seem to indicate that [Eickelberg] was in agreement that 100 basis points made sense." Dkt. 15-11 at 533. When shown Mietlicki's notes, Kalwarski testified that Eickelberg's statement "would have [come] after [Kalwarski] had discussed with the [T]rustees the 50 to 150 [basis point] consideration [he] was having." *Id.* at 569. Kalwarski also testified "that the Trustees did not all agree that the withdrawal discount rate should be reduced." *Id.* at 762–63; *see also id.* at 569–70. Some of the Trustees, for example, were concerned that any risk premium could interfere with the Fund's efforts to attract new employers to join. *Id.* at 570. Others expressed the view that a lower rate was warranted to protect the non-withdrawing employers from the risk that they would be left to cover for UVBs. *Id.* According to Kalwarski, he "[e]ventually . . . decided" to apply a risk premium of 100 basis points below the valuation discount rate. *Id.* at 569. When asked: "So you arrived at the 100 basis points based on the exercise of your own personal professional actuarial judgment," he responded, "Correct." *Id.* at 569–70.

Electrolux disputes that assertion and, for support, offers the minutes of the Pension Working Group meeting, which indicate that the Trustees "unanimously approved" Cheiron's recommendation to set the discount rate for withdrawal liability at the funding discount rate less

100 basis points.  Dkt. 15-7 at 711.  Based on this document, Electrolux argues that it was the Board, and not Kalwarski or Cheiron, that made the ultimate decision.  The Fund, in turn, responds by proffering the deposition testimony of the Fund's Executive Director, Ryk Tierney, who prepared the minutes and a related email.  In the email, sent six months after the January 24, 2018, meeting, Tierney explained that because the Board reconvened after the Pension Working Group meeting, and since Tierney's executive assistant "was not in the room to record [the discussion] for the minutes," the original draft of the minutes failed to include the "omnibus motion" presented during the reconvened session.  Dkt. 15-8 at 2.  To make matters worse, Tierney had "destroyed [his] handwritten notes" after reviewing the original draft and before he realized that the minutes were incomplete, and, accordingly, he had "to recreate that section" based on his recollection alone.  *Id.*  When asked about the minutes at deposition, Tierney testified that his late-drafted minutes mistakenly reported that the Board had decided to adopt the 100-basis-point risk premium and that, in fact, "Kalwarski, and not the [T]rustees, made the decision to have a discount rate of a hundred basis points below the value."  Dkt. 15-11 at 232–33, 241–42, 244.

In December 2018, Kalwarski decided to reduce the withdrawal liability discount rate further—from 6.5% (that is, 7.5% less the 100-basis-point risk premium) to 6.0%.  *Id.* at 572. He explained his reasons as follows:

> It became clear that the [F]und's discount rate was—we were going to drop it to 7 and lower in the coming years.  We didn't do it precisely at this time because, for the contributing employers, whether you lowered the discount rate this year or in year 2 or year 3, the employers remaining in the fund wouldn't make up any difference.
>
> But for a withdrawn employer, once they're out, that subsequent lower discount rate, they would not be part of.

13

> And so at this point in time, at this meeting, we were using 7 percent as a planning assumption, not as a funding assumption, planning for designing the rehab plan and the like, and felt that it was appropriate to maintain 100 basis points difference from that number, the 7 percent number for planning, which translates to 150 from the discount rate of 7-1/2 that we were still using for the Schedule B.

*Id.* at 572–73. Consistent with that intention, the Fund did subsequently lower the funding discount rate, first to 7.25% in 2021 and then to 6.85% in 2022. *Id.* at 552.

On June 27, 2020, Electrolux withdrew from the Fund. *Id.* at 506 (Joint Stipulation ¶ 2). Four months later, the Fund notified the company that its withdrawal liability was $32,205,208, payable in 60 quarterly payments and one additional final payment. *Id.* (Joint Stipulation ¶ 3). Assuming a discount rate of 6%, all agree that this amount was correctly calculated. *Id.* at 506–07 (Joint Stipulation ¶ 5). On April 26, 2021, Electrolux timely commenced an arbitration challenging the assessment. *Id.* at 91.

**2.**

The arbitrator conducted an evidentiary hearing on March 21 and 22, 2024, at which four witnesses appeared: Kalwarski, Mietlicki, and an actuarial expert for each of the parties. *Id.* at 752. The arbitrator also considered 75 exhibits, including transcripts of the depositions of Nelson and Tierney, the parties' stipulations, and each party's expert reports. *Id.* at 752–53. The parties also summarized their respective positions in post-hearing briefs. *Id.* at 753.

Electrolux challenged the assessment on a variety of grounds. It argued that the Trustees selected or unduly influenced the decision to apply the 6% discount rate, even though ERISA commits that determination to an unbiased actuary; that the discount rate, in any event, was not based on the Fund's actual experience and characteristics; that the actuary's methods or the discount rate that he selected were outside the scope of reasonable actuarial practice; and, finally,

that the withdrawal liability discount rate was not sufficiently "similar" to the funding discount rate to pass muster under the D.C. Circuit's decision in *Energy West*, 39 F.4th at 743.

The arbitrator was unpersuaded.  She agreed with Electrolux that the actuarial assumptions used to calculate an employer's withdrawal liability must be independently determined by the actuary and that a plan's trustees may not dictate or unduly influence the actuary's "best estimate" of the fund's anticipated experience.  Dkt. 15-11 at 756.  But she found, as a matter of fact, that Kalwarski—and not the IAM Trustees—determined the 6% discount rate used to calculate Electrolux's withdrawal liability and that he did so without undue influence from the Trustees.  *Id.* at 759–65.  She also found that Kalwarski credibly testified that his "best estimate" of investment returns was a "range" and that the discount rate that he selected was within, albeit "at the conservative end of[,] that range."  *Id.* at 766.  In her view, Kalwarski's testimony and the testimony of the Fund's expert demonstrated that the discount rate that Kalwarski selected was consistent with sound actuarial practices, was reasonable, and was based on the Fund's projected performance.  *Id.* at 767–72.  Finally, the arbitrator found that the 6% discount rate was "similar" to the discount rate used for purposes of satisfying the minimum funding requirement.  *Id.* at 772–73.  Both rates were, in her view, "within a reasonable range of estimated anticipated investment experience," and the 150-basis-point difference was far less than the 500-basis-point difference that the D.C. Circuit deemed presumptively dissimilar in *Energy West*.  *Id.* at 773.

Based on the entire record, then, the arbitrator found that Electrolux had failed to carry its burden of proving that the Fund's actuary "used actuarial assumptions and methods which, either individually or in the aggregate, were unreasonable (taking into account the experience of the plan and reasonable expectations)" or that the actuary erred "in applying the actuarial

15

assumptions or methods in this case." *Id.*  She, accordingly, denied Electrolux's challenge to the calculation of its withdrawal liability.  *Id.* at 774.

### 3.

Electrolux timely brought this action to vacate the arbitral award, *see* Dkt. 1 (Compl.), and the Fund brought a counterclaim to confirm the award, *see* Dkt. 11.  After submitting the administrative record, *see* Dkt. 15, Electrolux moved for summary judgment, *see* Dkt. 16, and the Fund both opposed that motion and cross-moved for summary judgment, *see* Dkts. 17, 19. The matter is ripe for decision.

### II. ANALYSIS

In its motion for summary judgment, Electrolux reasserts the same challenges that it raised before the arbitrator, although it faces an even more demanding standard of review at this stage of proceeding.  The arbitrator's (and the actuary's) legal conclusions are reviewed *de novo*. *Energy W.*, 39 F.4th at 737.  But her "findings of fact are presumed correct unless they are rebutted 'by a clear preponderance of the evidence.'" *Id.* (quoting 29 U.S.C. § 1401(c)).  As the Seventh Circuit explained in *Jos. Schlitz Brewing Co.*, Congress seems to have conflated two standards in the phrase "a clear preponderance of the evidence"—the preponderance of evidence standard, which typically governs trial-level factfinding, and the "clearly erroneous" standard, which typically guides review of trial-level factfinding.  3 F.3d 994, 998–99 (7th Cir. 1993), *aff'd on other grounds*, 513 U.S. 414 (1995).  Undertaking the judicial "[r]epair" necessary to give the governing text an intelligible meaning, the Seventh Circuit read the statute to require the reviewing court to determine whether the arbitrator's factual findings, made under the "preponderance of the evidence" standard, were "clearly erroneous." *Id.*  Other courts, including this Court, have adopted that reading of the statute, *see Clark County I*, 664 F. Supp. 3d at 33;

16

*see also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 375 (4th Cir. 2006); *Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emps. v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1037 (11th Cir. 2004); *Dantran, Inc. v. U.S. Dep't of Labor*, 171 F.3d 58, 70 (1st Cir. 1999), and, notably, Electrolux does not dispute that it carries the burden of demonstrating that the arbitrator's factual findings were "clearly erroneous," *see* Dkt. 16-1 at 6.

In the ordinary course, that is a demanding standard. It is particularly demanding in the present context, however, because the actuary's "determination of withdrawal liability [also] receives considerable deference in the arbitration process." *Clark County I*, 664 F. Supp. 3d at 29. Under the MPPAA, the arbitrator must "presume[]" that "any determination made by a plan sponsor" regarding withdrawal liability is "correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). The arbitral review provision further specifies that:

> the [plan's] determination of . . . unfunded vested benefits for a plan year . . . is presumed correct unless a party contesting the determination shows by a preponderance of evidence that—
>
> (i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or
>
> (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

*Id.* § 1401(a)(3)(B). This standard of arbitral review mirrors the substantive standard that guides the plan actuary, who must determine withdrawal liability for "each plan" based on "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." *Id.* § 1393(a)(1).

17

Taken together, these provisions require this Court to review the arbitrator's factual findings regarding the reasonableness of the actuary's actuarial assumptions and methods for clear error. That is, the Court must determine whether the arbitrator clearly erred in finding that the Fund's assessment of withdrawal liability was based on the actuary's "best estimate" of the Fund's anticipated performance and whether that estimate was reasonable. The arbitrator may not substitute her assessment of the "best estimate of anticipated experience" for that of the actuary, and the Court may not substitute its findings of fact for those of the arbitrator. The factual questions for the Court, accordingly, are limited to whether the arbitrator committed clear error in finding that (1) the actuary determined the discount rate at issue without undue influence from the Trustees, (2) the rate represented his "best estimate" based on the plan's actual anticipated investment experience, and (3) his actuarial assumptions were reasonable.

With this double-level of deference to factual determinations in mind, the Court turns to Electrolux's challenges.

## A.    Trustee Influence Over Selection of the Discount Rate

Electrolux first argues that the Fund's Trustees either usurped or unduly influenced the actuary's statutory role in selecting the withdrawal liability discount rate. The major premise of Electrolux's argument is non-controversial: All agree that the actuarial assumptions used to calculate an employer's withdrawal liability must be determined by the plan actuary—and not by the plan's trustees—and that the plan's trustees may not unduly influence the actuary in making his determination. In the words of the MPPAA, an employer's withdrawal liability must be determined "on the basis of . . . *the actuary's* best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1) (emphasis added); *see also id.* § 1401(a)(3)(B). Or, in the words of the Supreme Court, "the assumptions and methods used in calculating withdrawal liability are selected in the first instance not by the trustees, but by *the plan actuary*." *Concrete Pipe*, 508

18

U.S. at 632 (emphasis added). This allocation of responsibility ensures that the determination of withdrawal liability is made by "an apparently unbiased professional," *id.* at 635, "who is subject to regulatory and professional standards," *id.* at 609, and who—unlike a trustee—is not a fiduciary who "owe[s] an exclusive duty to the fund," *id.* at 616 (quoting *United Retail & Wholesale Emps. Teamsters Union Loc. No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 139 (3d Cir. 1986) (emphasis omitted)); *see also CPC Logistics*, 698 F.3d at 355 ("The actuary is a professional, assumed to be neutral and disinterested; a plan's trustees, in contrast, may . . . want unreasonably high or unreasonably low interest-rate assumptions").

The minor premise of Electrolux's argument, in contrast, is hotly disputed: The Fund denies Electrolux's allegation that the Trustees made the decision to adopt the 6% discount rate or unduly influenced Kalwarski in making that decision, and it invokes sworn testimony in support of its position. After considering all of the evidence, the arbitrator resolved this question of fact in favor of the Fund. Dkt. 15-11 at 764–65. In relevant respects, she found as follows:

> The evidence in the record, including testimony that I find credible, does not support Electrolux's assertion that the actuary did not select the discount rate, that he was directed by the Trustees to lower the rate, or that he was unduly or heavily influenced by the Trustees in selecting the assumption. Mr. Kalwarski testified (multiple times) that he selected the discount rate assumption. The evidence establishes that he knew that it was his responsibility to select the discount rate assumption, and he so informed the Trustees verbally and in writing. Nothing Mr. Kalwarski heard from the Trustees pushed him to select a discount rate that was outside of the range he was considering before hearing from the Trustees. He initially selected the mid-point in his intended 50 to 150 basis point range. The Trustees expressed both negative and positive views about reducing the discount rate for withdrawal liability purposes. The testimony of the other Cheiron witnesses (Messrs. Mietlicki and Nelson) corroborated Mr. Kalwarski's testimony. Lengthy cross-examination did not yield any testimony to undermine the witnesses' testimony or credibility, and no possible reasons for the Cheiron witnesses to be dishonest were suggested. Notably, Cheiron no longer serves as the Fund's actuary.

19

*Id.* Electrolux raised several arguments to the contrary before the arbitrator, and it renews those arguments in this action.

As explained above, the Court must review the arbitrator's findings under the clearly erroneous standard. To be sure, this does not relieve the Court of responsibility to review the record as a whole and to consider the plausibility of the testimony. "[T]he clear-error standard is not a rubberstamp, even when the trier of fact is called an arbitrator rather than a judge." *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994). But, at the same time, that does not mean that the Court may reweigh the evidence or second-guess the arbitrator's reasonable findings. Instead, this Court must accord the arbitrator's findings the same deference that appellate courts typically accord to the factual findings of trial courts and may, accordingly, set aside the arbitrator's findings only if, after reviewing the record as a whole, the Court "is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also Concrete Pipe*, 508 U.S. at 622 (quoting same). Applying that deferential standard, the Court is unpersuaded by Electrolux's argument.

Electrolux relies on several exhibits to support its contention that the Plan's Trustees, rather than the actuary, decided to adopt the initial 100 basis point risk premium for purposes of calculating employer withdrawal liability after 2018. It relies on (1) a November 2017 email to Kalwarski from another Cheiron actuary indicating that one "takeaway[] from [a] November meeting was to prepare a [withdrawal liability] policy options [PowerPoint] to present at the January 2018 board meeting" and discussing the "need to provide a fee quote for this work," Dkt. 15-7 at 621; *see* Dkt. 16-1 at 15; (2) the PowerPoint presentation, which (a) is captioned "Withdrawal Liability Policy Discussion," Dkt. 15-7 at 669, (b) refers to "Options for discount

20

rate," *id.* at 687, (c) notes that "[t]he more conservative the discount rate, the more protection given to on-going employers, but less desirable to new employers," *id.*; and (d) fails to identify "the 100-basis-point difference that the Fund ultimately selected," Dkt. 16-1 at 16; *see also* Dkt. 15-7 at 688; (3) Mietlicki's notes from the January 24, 2018, meeting, which (a) indicate that "50-100 bps is appropriate risk premium for these purposes," Dkt. 15-7 at 726, (b) refer to "protect[ing]" employers "that are staying in" the plan from unfairness, *id.*, and (c) reflect Eickelberg's support for a withdrawal liability discount rate "100 bps below" the valuation rate, *id.*; *see also* Dkt. 15-11 at 773; (4) the absence of any documentation that Kalwarski calculated a "best estimate" range; and, finally, (5) the minutes of the January 24, 2018, meeting, which indicate that the Board "unanimously approved" several "recommendations" from the actuary, including his recommendation to adopt a withdrawal liability discount rate equal to the "[f]unding [d]iscount [r]ate less 100 basis points," Dkt. 15-7 at 711.

According to Electrolux, this evidence shows that it was the Trustees, and not Kalwarski, who initiated the process of changing the actuarial assumptions; that the decision was policy-laden; that the co-chair of the Board advocated for a discount rate lower than the discount rate included in Cheiron's presentation; and that the Board ultimately "approved" what was only a "recommendation" from the actuary. Dkt. 16-1 at 15–17. In short, on Electrolux's telling, "[t]he facts overwhelmingly show that the Fund wielded improper influence over the change that was made to the withdrawal liability assumptions in 2018," *id.* at 15, in violation of the MPPAA's direction that the actuarial assumptions "represent the actuary's own judgment," *id.* at 17 (quoting *Energy W.*, 39 F.4th at 739).

Although Electrolux's inferences are plausible, the evidence is not nearly as one-sided as Electrolux suggests, and other evidence supports the Fund's contrary contention (and, more

21

importantly, the arbitrator's factual finding) that Kalwarski made the decision to adopt the discount rate used to calculate Electrolux's withdrawal liability and that he did so without undue influence from the Trustees. The arbitrator's findings are well-supported and far from clearly erroneous.

To start, the arbitrator reasonably found that Kalwarski, rather than the Trustees, initiated the process that led to adoption of the revised discount rate. Dkt. 15-11 at 765. As she explained, the evidence showed that "[i]n mid-2017, . . . Kalwarski advised the Trustees that the Fund had gone from being fully funded to having UVBs as of the end of the 2016 plan year," and, as a result, "employers that withdrew from the Fund would owe withdrawal liability." *Id.* at 760; *see also id.* at 521. Mietlicki testified that these new circumstances prompted Cheiron to decide "that it would be useful to present to the [T]rustees a PowerPoint on calculation of withdrawal liability," *id.* at 521, which was not at issue before the end of 2016. Other documentation, moreover, confirms Cheiron's focus on the question of withdrawal liability prior to November 2017. *See* Dkt. 15-7 at 615–19. And when asked what led Cheiron to prepare the PowerPoint presentation, Kalwarski explained:

> [T]his is the first time this fund . . . was going to have unfunded vested benefits or withdrawal liability. It never had that in our previous time with the fund, because we never really discussed the topic with the [T]rustees.
>
> Now that we knew it was coming, we felt the [T]rustees didn't have a lot of knowledge or experience with withdrawal liability, so this was primarily an educational presentation.

Dkt. 15-11 at 561.

The arbitrator found that Kalwarski's testimony was "credible" and that "[t]he Trustees did not initiate the process that resulted in the actuary's selection of the discount rate." *Id.* at 765. That finding is well-supported. The only evidence that Electrolux cites to the contrary is

the November 28, 2017, email to Kalwarski, indicating that the Board wanted Cheiron to make a presentation on withdrawal liability policy options at the January 2018 Board meeting. Dkt. 15-7 at 621. But that email does not show that the Board "initiated" the process for lowering the discount rate and does not controvert Kalwarski's sworn testimony that Cheiron prepared the PowerPoint merely to educate the Board about withdrawal liability options in light of the emergent underfunding of the Plan.

The arbitrator also reasonably credited Kalwarski's sworn testimony that he selected the withdrawal liability discount rate based on his—and not the Trustees'—"best estimate" of the fund's anticipated performance. Dkt. 15-11 at 766. Although Cheiron no longer served as the Fund's actuary at the time of the arbitration, and although, in the words of the arbitrator, there were "no possible reasons for the Cheiron witnesses to be dishonest," *id.* at 765, Kalwarski testified without "falter" that he selected the discount rate from the conservative end of a "range" that represented his "best estimate" of anticipated performance, *id.* at 766; *see also id.* at 764–65. "[O]ther Cheiron witnesses," moreover, "corroborated [his] testimony." *Id.* at 765. And notably, Electrolux's "[l]engthy cross-examination" of the Fund's witnesses did not "yield any testimony to undermine the witnesses' testimony or credibility." *Id.*

At the hearing, Kalwarski testified that the decision to adopt a 100-basis-point risk premium was his decision. *Id.* at 568–70. He explained that he arrived at the January 28, 2018, meeting with a plan to "establish[] a risk premium" of "no less than 50 basis points and no more than 150 basis points" and that he "wanted to have an open discussion with [T]rustees to validate what [his] decision was going to be." *Id.* at 568–69. He made clear, however, that after hearing from the Trustees, he—and not the Trustees—"decided to land at 100 basis points." *Id.* at 569; *see id.* ("Eventually, I decided it would be 100"). When asked: So *you* arrived at 100 basis

points based on the exercise of *your own personal professional actuarial judgment*," Kalwarski responded: "Correct." *Id.* at 569–70 (emphasis added). Mietlicki, who was also present at the January 28, 2018, meeting, confirmed that "the decision was made by" Kalwarski, *id.* at 542, and Mietlicki resisted repeated efforts on cross-examination pressing him to concede that Kalwarski merely acceded to the Trustees' "consensus" to adopt a 100-basis-point risk premium. *Id.* at 542–43.

Electrolux relies on two sets of documents to challenge this testimony:

*First*, it relies on the PowerPoint presentation that Cheiron made at the January 28, 2018, meeting, Dkt. 16-1 at 10, 15–16; *see also* Dkt. 15-7 at 669–95, along with Mietlicki's contemporaneous notes from the meeting, *id.* at 725–31. On Electrolux's telling, these documents show that Cheiron teed up various "policy" "options" for the Trustees; that the 100-basis-point withdrawal liability discount rate was not among those options; and that it was the co-chair of the Board that first proposed and advocated for the 100-basis-point option, which the Fund ultimately adopted. Dkt. 16-1 at 15–16. But, as the arbitrator found, neither document indicates that the Trustees made—or unduly influenced—the decision to adopt a 100-basis-point risk premium. To the contrary, the PowerPoints explicitly delineated which decisions were for the Trustees (e.g., "Allocation Method," Dkt. 15-7 at 670), and which were reserved for the actuary (e.g., "Asset Valuation Method," *id.*). The PowerPoints identified the "Discount Rate" as one of the decisions committed to the actuary, *id.*, and, indeed, included a slide captioned "Actuary's Decisions," which stated: "With input from the Trustees, Actuary determines asset valuation method and discount rate." *Id.* at 685. Kalwarski confirmed that Cheiron made clear to the Trustees that setting the withdrawal liability discount rate was "the actuary's decision." Dkt. 15-11 at 570.

Nor does the PowerPoint presentation's reference to "policy" "options" or its omission of a 100-basis-point option undercut the arbitrator's finding that Kalwarski made the decision to adopt the 100-basis-point risk premium. The presentation, to be sure, refers to the "Current Policy" of applying the 7.5% valuation discount and offers various "Options" for determining the relevant discount rate, including applying the valuation rate, the PBGC rates, a blended rate, or a "valuation rate less" a set percentage. Dkt. 15-7 at 672. But Kalwarski explained that the presentation was "educational" and was intended to inform the Trustees about how various approaches might affect UVBs going forward. Dkt. 15-11 at 561. He further explained that the PowerPoint slide that included various calculations of UVBs using the valuation rate, the PBGC rates, a blended rate, or a "valuation rate less" 50-basis-point rate was not intended to convey his recommendations or options for the Trustees to select among. *Id.* at 565–66. Rather, the slide was to show "the sensitivity of the discount rate and asset method on the unfunded vested benefit." *Id.* at 565. The fact that the slide referred to a 50-basis-point adjustment—rather than 100 or 150 basis-points—was therefore immaterial; Cheiron just wanted to show the sensitivity of UVBs to various discount rates and methodologies. *Id.* at 565–66.

Similarly, although Mietlicki's notes indicate that the co-chair of the Board expressed the view that a 100-basis-point reduction below the valuation rate made sense, Dkt. 15-7 at 726; *see also* Dkt. 15-11 at 533, the Fund has never disputed that Kalwarski sought input from the Trustees, and Mietlicki's notes do not say that the co-chair was insistent about this position, much less that he made the decision or unduly influenced Kalwarski. Kalwarski, moreover, testified that the co-chair would not have expressed his view until after Kalwarski had told the Trustees that he was considering an adjustment of between 50 and 150 basis points, Dkt. 15-11 at 569, and further testified that the co-chair's perspective was just one among many, *id.* at 762–63;

25

*see also id.* at 569–70. Some of the Trustees, for example, were concerned that any risk premium could interfere with the Fund's efforts to attract new employers to join. *Id.* at 570. Others expressed the view that a lower rate was warranted to protect the non-withdrawing employers from the risk that they would be left to cover for UVBs. *Id.* Although the Trustees expressed these varying perspectives, Kalwarski was emphatic that he, and not the Trustees, decided to apply a risk premium of 100 basis points below the valuation discount rate. *Id.* at 569.

*Second*, "and perhaps most powerfully," Electrolux invokes "the official minutes from [the Board] meeting," which indicate "that the [B]oard *voted to adopt* a 100-basis-point risk premium." Dkt. 16-1 at 17 (emphasis in original); *see* Dkt. 15-7 at 711. But, once again, the story is not that simple. As explained above, Tierney testified at deposition that he prepared the minutes and a related email six months after the January 24, 2018, meeting and that he did so without any contemporaneous notes. Dkt. 15-11 at 232–33. In the email, Tierney explained that because the Board reconvened after the Working Group meeting, and since his executive assistant "was not in the room to record [the discussion] for the minutes," the original draft of the minutes failed to include the "omnibus motion" presented during the reconvened session. Dkt. 15-8 at 2. Tierney's email further recounted that he had "destroyed [his] handwritten notes" after reviewing the original draft and before he realized that the minutes were incomplete, and that, as a result, he had "to recreate that section" based on his recollection alone. *Id.* When asked about the minutes at deposition, Tierney testified that he mistakenly reported that the Board had decided to adopt the 100-basis-point risk premium, when, in fact, "Kalwarski, and not the [T]rustees, made the decision to have a discount rate of a hundred basis points below the value." Dkt. 15-11 at 232–33; *see also id.* at 241–42, 244. According to Tierney, in recreating events

26

from memory and without the benefit of notes six months after the fact, he conflated the

Trustees' approval of other matters considered at the same time, which were within their

bailiwick, with the discount rate, which was not. *Id.* at 244. The arbitrator credited that sworn

testimony, *id.* at 763, and the Court has no reason to second-guess that reasonable finding of fact.

Electrolux offers two final rejoinders:

*First*, it points to "Tierney's near contemporaneous email," in which he observed that the

Board reconvened to "officially adopt the changes." Dkt. 18 at 9 (quoting Dkt. 15-8 at 2). But,

in fact, Tierney sent that email six months after the Board meeting, Dkt. 15-8 at 2, and, in any

event, he explained at his deposition that the Board "did adopt some changes," just not the

withdrawal liability discount rate, Dkt. 15-11 at 244.

*Second*, Electrolux suggests that the arbitrator's finding should be accorded less weight

because it was based on deposition testimony and because "Tierney refused to attend the

[arbitration] hearing." Dkt. 18 at 9 & n.2. Because the Fund disagreed with this characterization

of why Tierney did not testify at the hearing, Dkt. 21 at 8 & n.2, the Court directed counsel to

submit the relevant correspondence, *see* Min. Order (Apr. 8, 2026), which the Fund's counsel did

on April 13, 2026, *see* Dkt. 24. Having reviewed that material, the Court is persuaded that, after

some back and forth and in light of logistical and timing considerations, counsel for Electrolux

agreed not to call Tierney as a witness at the arbitration. Tierney did not refuse to attend. But

even putting this issue aside, the Court—like the arbitrator—finds Tierney's deposition

testimony credible. Given the passage of time and his lack of notes, it is not at all surprising or

suspect that Tierney conflated issues that were committed to the Trustees for decision with those

that were not.

Electrolux's final argument on this topic is more defensive than offensive. According to the Fund, Electrolux spends most of its energy attacking the wrong determination, since the relevant discount rate is the 6.0% rate that Kalwarski adopted in December 2018, rather than the 6.5% rate that he adopted in January 2018. Dkt. 15-11 at 764. On the Fund's telling, the events that occurred in January 2018—which form the gravamen of Electrolux's argument—are therefore beside the point. *See* Dkt. 17 at 31. Electrolux responds that Kalwarski's December 2018 decision was merely intended "to *maintain* the 100-basis-point risk premium" that was adopted in January, "because [Cheiron] expected that the Fund's funding rate would be lowered to 7%" in the near future. Dkt. 16-1 at 20 (emphasis in original). Ultimately, however, this is a non-issue. Because the Court has already concluded that the arbitrator did not commit clear error in crediting Kalwarski's testimony (and the related testimony offered by Mietlicki and Tierney) that it was Kalwarski who made the decision to adopt the risk premium in January 2018, little turns on whether his further action in December 2018 is better viewed as an independent decision or an extension of his January 2018 decision. Either way, the Court is persuaded that the evidence supports the arbitrator's finding of fact.

**B.      The Actuary's Best Estimate of the Plan's Actual Anticipated Experience**

Under the MPPAA, a plan's actuary is vested "with discretion to use his professional judgment about what assumptions are used to calculate withdrawal liability." *Energy W.*, 39 F.4th at 737. That discretion—or in the words of the Supreme Court that "imprecision"— "inheres in the choice of [indeterminate] actuarial methods and assumptions" that actuaries must make and, thus, "is simply in the nature of the beast." *Concrete Pipe*, 508 U.S. at 635–36. The MPPAA does, however, bridle the actuary's discretion in important respects: The actuarial assumptions must be "based on the plan's particular characteristics" and the actuary's "best estimate of anticipated experience under the plan." *Energy W.*, 39 F.4th at 738 (quoting 29

28

U.S.C. § 1393(a)(1)).  As relevant here, "[w]hen calculating withdrawal liability, actuaries must select a discount rate based on the plan's actual anticipated investment experience."  *Id.*

Electrolux challenges the arbitrator's conclusion that the 6.0% withdrawal liability discount rate that Kalwarski adopted was based on his "best estimate" of the Fund's actual anticipated experience, as required by the MPPAA.  Dkt. 16-1 at 20.  That challenge takes two forms:  Electrolux first argues that the arbitrator's factual findings are clearly erroneous, and, second, it argues that she committed legal error.  *Id.* at 20–21.  Because different standards of review apply, the Court will first consider Electrolux's factual arguments (which are subject to clear error review) before turning to its legal contentions (which are subject to *de novo* review).

**1.**

Although the actuary's "discount rate assumption cannot be divorced from the plan's anticipated investment returns," the D.C. Circuit has recognized that "there may be a reasonable range of estimates."  *Energy W.*, 39 F.4th at 740.  That makes sense, of course, because actuarial assumptions require "predictive judgments about a plan's anticipated future performance," which "are adopted for the purpose of a particular calculation or measurement" and which "are not generally 'in effect' in the" same way that "observable facts" are fixed and knowable.  *M & K Emp. Sols.*, 146 S. Ct. at 1230–31.  Here, Kalwarski testified that his "best[]estimate" of the anticipated performance of the Fund was a "range" from as low as 5.5% (or perhaps 5.25%) to as high as 7.75%.  Dkt. 15-11 at 550.  The discount rate he applied for minimum funding purposes (7.5%) fell near, but not at, the high end of this range, while the discount rate that he applied for withdrawal liability purposes (initially 6.5%, and later 6.0%) fell near, but not at, the low end of this range.  *Id.* at 548, 558, 563.

Although recognizing that Kalwarski "did not document [that] range," *id.* at 762; *see also id.* at 766, the arbitrator credited his testimony.  She found as follows:

> The absence of documentation of a range (or the communication of the range to the Trustees, which Mr. Kalwarski also testified to) does not convince me that Mr. Kalwarski did not have a range of reasonable estimates in mind, as he testified and as was his practice.  As the Fund's longtime actuary, he was required to calculate the Fund's projected returns, based on its investments, for minimum funding and valuation purposes every year.  It strains credulity that Mr. Kalwarski would not have considered a range of reasonable assumptions annually as well.  The lack of documentation of a range is not a sufficient basis to reject Mr. Kalawarski's [sic] testimony and to infer that none was developed.  Finally, that Mr. Kalwarski arrived at his assumption by subtracting a fixed percentage from the funding rate to account for risk-shifting does not negate that he developed a reasonable range of investment returns, and the assumption he selected fell within that range.

*Id.* at 766–67.  Electrolux disputes this finding.  It argues that "the record wholly undermines Kalwarski's claim that he ever actually undertook such a calculation," and that "[t]he [a]rbitrator committed clear error in indulging that revisionist fiction."  Dkt. 16-1 at 20–21.  The Court is unpersuaded.

Electrolux's challenge to the arbitrator's factual finding that Kalwarski truthfully testified that he calculated a "best-estimate range" of between 5.5% (or 5.25%) and 7.75% focuses on the lack of written documentation of that calculation and lack of corroborating testimony.  *Id.* at 21–24.  "This lack of documentation," Electrolux argues, "stands in stark contrast to the process used by the Fund's expert witness, Cary Franklin, to develop his opinion for this case," which generated detailed working papers.  *Id.* at 22.  Electrolux further argues that Kalwarski's testimony, which attributed his failure to "memorialize in writing [his] best-estimate range" to the fact that "the best-estimate range changes over time" as the economy changes and to his typical practice of "wait[ing] until the final decision is made" before "put[ting] [it] in writing," Dkt. 15-11 at 550, was incredible, *see* Dkt. 16-1 at 23.  Finally, Electrolux contends that

30

Kalwarski's claim that he calculated a best-estimate range of between 5.5% (or 5.25%) and 7.75% (1) cannot be reconciled with his use of a 7.5% minimum funding rate or investment target, (2) is at odds with the range that "Franklin calculated the Fund's assets could earn on a 20-year time horizon," and (3) is contrary to the governing actuarial standards—all of which call the truthfulness of his testimony further into doubt.  Dkt. 16-1 at 23–24 & n.2.

Once again, Electrolux's arguments are plausible but far from sufficient to overcome the deference the Court owes to the arbitrator's findings of fact.  Electrolux maintains that the arbitrator committed clear error in crediting Kalwarski's sworn testimony because Kalwarski did not "put any range into writing for any party," and the Fund failed to produce any "documents showing [Kalwarski's] mathematical work."  *Id.* at 22.  But, as the arbitrator explained, Kalwarski described "the process [that] he used to develop the range and [the] inputs and variables he considered."  Dkt. 15-11 at 766.  Kalwarski explained that he started by "asking the investment consultant to provide four or five possible portfolios," with "an expected return and an annual standard volatility" for each.  *Id.* at 549.  The range of portfolios would include "an aggressive portfolio, less aggressive, something in the middle, and then conservative."  *Id.* Using that data, he then ran "a stochastic"—or probabilistic—"analysis of the portfolio" and determined which "asset allocation risk profile" the trustees were "most comfortable with," before applying "that allocation to the Horizon survey to see what [came] out of that."  *Id.*  When asked whether the "225-basis point spread" between the bottom and top of his best-estimate range might have changed by 2020, Kalwarski noted that the Horizon Actuarial Survey of Capital Market Assumptions spread "has always been somewhere in the neighborhood of 200 to 250 [basis points] over time," although the spread "changed by 2020" to "roughly 200 basis points through a ten-year period ending in 2020."  *Id.* at 550.  For comparison, a 2017 "Survey of

31

Capital Market Assumptions" report from Horizon Actuarial Services included in the administrative record showed a range of about 200 basis points for a "10-Year Horizon" and a slightly larger range for a "20-Year Horizon."  Dkt. 15-7 at 555.

Although Electrolux argues that "[n]obody involved in the Fund's January 2018 decision recalled Kalwarski discussing any 'range,'" Dkt. 16-1 at 23, that overstates what the record shows.  At the arbitration, the following exchange took place between counsel for Electrolux and Kalwarski:

> Q.     In connection with the development of the best-estimate range . . . isn't it the case that you never communicated with the IAM Fund [T]rustees that you ha[d] a best-estimate range rather than a single best estimate for the plan's long-term investment return assumption?
>
> A.     That's not true.  I would communicate to them in open meetings.
>
> Q.     . . . And you recall communicating the best-estimate range in open meetings?
>
> A.     I always communicated that concept.
>
> Q.     . . . Did you ever put the best-estimate range in writing to the IAM Fund [T]rustees?
>
> A.     No, because I typically wait until the final decision is made and put that in writing.

Dkt. 15-11 at 549–50.  And, when pressed again, Kalwarski affirmed: "I know for a fact that I did often speak of [the best-estimate range] at board meetings."  *Id.* at 550.  Tierney, in turn, could not recall whether Kalwarski discussed the best-estimate range at the meeting, but he said that "it sounds vaguely familiar," *id.* at 206, and Nelson testified that it was "typical" for Cheiron consultants to develop "a reasonable range" for a particular fund, *id.* at 126–27, 138–39.  Most importantly, no one contradicted Kalwarski's testimony.

32

Electrolux's remaining factual arguments cast little doubt on the veracity of Kalwarski's testimony.  Although Electrolux correctly observes that the Fund had a targeted investment return of 7.5%, *see* Dkt. 15-1 at 234, 250, the company's assumption that the 7.5% target would necessarily have fallen near the middle (rather than near the top) of any *genuine* best-estimate range is incorrect.  As other evidence offered at the arbitration showed, Cheiron's discount rate assumptions did not invariably move in lockstep with the Fund's targeted investment return. *Compare*, *e.g.*, Dkt. 15-1 at 280 (April 2019 absolute return target of 7.0%), *with* Dkt. 15-11 at 552 (Kalwarski explaining that he nonetheless kept the valuation discount rate at 7.5%).  The two concepts undoubtedly bear a close relationship, but it is not the one-for-one relationship that Electrolux posits, and, in any event, the fact that the targeted investment return was near (but not at) the high-end of Kalwarski's best-estimate range does not show that his testimony was untruthful.  This is particularly true in an environment in which anticipated returns were declining and UVBs were increasing.  As Kalwarski testified, between 2018 and 2020, he informed the Trustees that it was necessary to bring the "investment return assumption" down because the Fund had started to fall "into an endangered or critical status."  Dkt. 15-11 at 551. Although the 7.5% rate did not "have to come down immediately," and although Kalwarski advised against lowering the discount rate "on the investment side" before Cheiron "saw how the [rehabilitation] plan" took form and how the Trustees might change its asset allocation, Cheiron was "preparing the [F]und to make those plan changes" and to bring the investment rate down. *Id.*  In short, much—although not all—of the mismatch was simply a matter of timing and uncertainty about changes that the Fund would need to make to redress the underfunding.

Similarly, the marginal difference between Franklin's and Kalwarski's calculations of the best-estimate range does not support Electrolux's contention that the arbitrator committed clear

error in crediting Kalwarski's sworn testimony.  To be sure, Franklin's range of anticipated returns over 20 years (6.02% to 9.12%) was slightly higher than Kalwarski's best-estimate range (5.5% or perhaps 5.25% to 7.75%).  *Id.* at 323.  When Franklin weighted the 10-year and 20-year expected returns, however his range (5.20% to 7.80%) was almost identical to Kalwarski's.  *Id.* at 323, 550.  But, in any event, in a realm in which such "imprecision" inheres in the process— that is, where it "is simply in the nature of the beast," *Concrete Pipe*, 508 U.S. at 635–36—the modest differences (if any) that Electrolux has identified are insufficient to call into question the veracity of Kalwarski's sworn testimony, much less to conclude that the arbitrator clearly erred in crediting his testimony.  What is more illuminating is the fact that the methodology that Kalwarski described, Dkt. 15-11 at 549–50, is similar to the methodology that Franklin applied, *id.* at 321–22, and, according to Franklin, the withdrawal liability discount rate that Kalwarski eventually used was reasonable and consistent with actuarial practices, *id.* at 315.

Finally, the parties may differ about whether the governing actuarial standards of practice ("ASOP") permit actuaries to use "best-estimate ranges," *compare* Dkt. 16-1 at 24, *with* Dkt. 17 at 35–36, but that difference in perspective does not show that Kalwarski testified falsely about what he did, *see* Dkt. 15-11 at 659–60 (Franklin testimony regarding "slight narrowing of the range[] from the old ASOP to the new ASOP"); *see also id.* at 762 n.2 (arbitrator's decision noting that Kalwarski did not use the phrase "best estimate range" to refer to the methodology removed from ASOP 27 in 2013).

For present purposes, the Court can assume that fair minds might differ about whether Kalwarski calculated a best-estimate range, as he repeatedly testified under oath that he did, or whether he concocted that testimony to support the Fund's position in the litigation, as Electrolux argues.  But that is not the question before the Court.  The question is whether the

arbitrator committed clear error in crediting Kalwarski's testimony. Measured against that standard, the question is not difficult. The Court concludes that Electrolux has failed to carry its burden of demonstrating that the arbitrator, who personally observed Kalwarski's testimony, considered the record as whole, and thoroughly explained her reasoning, clearly erred in finding that he was telling the truth. To the contrary, and although more than required to resolve the present dispute, the Court shares the arbitrator's view that Kalwarski's testimony was credible.

**2.**

Electrolux's legal challenge to the arbitrator's decision faces a less daunting standard of review (at least in part), and it presents a closer question, but it too fails. As the following discussion makes clear, moreover, much of what Electrolux characterizes as a legal challenge turns on the company's disagreement with the arbitrator's factual findings and, accordingly, does not permit *de novo* review. And, where *de novo* review is warranted, Electrolux's legal arguments fall short.

**a.**

The MPPAA mandates that, "[w]hen calculating withdrawal liability, actuaries must select a discount rate based on the plan's actual anticipated investment experience." *Energy W.*, 39 F.4th at 738. This means that the actuary must "use the plan's particular characteristics," *id.* at 740 (citing 29 U.S.C. § 1393(a)(1)), and may not rely on "a set formula that is not tailored to the unique characteristics of the plan," *id.* at 738 (quoting *Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund*, 15 F.4th 407, 421 (6th Cir. 2021)). According to Electrolux, Kalwarski violated this statutory mandate by "*starting* with the funding rate—as [his] single best prediction of anticipated plan experience—and then building in a buffer or 'risk premium' to 'protect[]' and 'compensate' the remaining employers." Dkt. 18 at 16 (emphasis and second

35

alteration in original) (quoting Dkt. 15-11 at 555–56, 562).  Although the discount rate that he applied fell within his best-estimate range, on Electrolux's telling, Kalwarski arrived at the 6.5%—and then 6.0%—withdrawal liability discount rate based on policy reasons that were not tied to the particular characteristics of the plan, and he used his best-estimate range only "to set boundaries around that policy-based risk premium."  Dkt. 16-1 at 25–26.  As a result, Electrolux argues, the 6.0% discount rate that Kalwarski used to calculate the company's withdrawal liability did not represent his "best estimate" of anticipated plan experience, and the assessment must therefore be set aside.  *Id.*

Electrolux raised this same argument in the arbitration, and the arbitrator was unpersuaded.  She agreed that the MPPAA requires actuaries to employ assumptions that represent their best estimate of anticipated performance based on the plan's particular characteristics.  *See* Dkt. 15-11 at 768.  But she was unconvinced that Electrolux had carried its "burden [of] show[ing] by a preponderance of the evidence that the withdrawal liability discount rate" that Kalwarski applied "was selected independently of the experience of the plan and reasonable expectations regarding the anticipated experience of the Fund."  *Id.* at 767.  In her view, the fact that the withdrawal liability discount rate "was within a range of reasonable estimates of the plan's anticipated experience (based on its actual investments), . . . establish[ed] that it reflect[ed] the 'characteristics' of the plan, 'how much interest the plan's assets [would] earn based on their anticipated rate of return,' and 'the plan's actual and anticipated investment experience.'"  *Id.* at 767–68 (quoting *Energy W.*, 39 F.4th at 738, 740).  Even more to the point, the arbitrator rejected Electrolux's contention that the risk premium was adopted for policy reasons "divorced from the plan's anticipated investment returns," *Id.* at 768 (quoting *Energy W.*, 39 F.4th at 740), and that Kalwarski's best-estimate range merely "set boundaries around that

policy-based risk premium," *see* Dkt. 16-1 at 26.  She found, to the contrary, that "[t]he 100 to 150 basis point reduction (for risk-shifting) was also plan-specific," and she found that the reduction "was based on the actuary's 'judgment' of the value of the risk premium, taking into account such factors as anticipated uncollectible withdrawal liability, bankruptcies, and the plan's underfunding."  Dkt. 15-11 at 768.  Thus, while agreeing with much of Electrolux's legal framework, the arbitrator found that the company had "failed to demonstrate that the Fund's actuary's methods or assumptions violated the substantive provisions of ERISA."  *Id.* at 769.

As explained below, the Court concurs with the arbitrator's conclusions.  She correctly described and applied the statutory presumption that a plan's determination of unfunded vested benefits is correct unless the contesting party shows that the actuarial assumptions were not based on "the experience of the plan and reasonable expectations," 29 U.S.C. § 1401(a)(3)(B)(i); she correctly applied the substantive statutory standard, *id.* § 1393(a)(1), and the controlling precedent, *see generally Energy W.*, 39 F.4th 730; her related factual findings were well founded and far from clearly erroneous, 29 U.S.C. § 1401(c); and she did not misapply the law to the facts, *see Clark County I*, 664 F. Supp. 3d at 33.

For present purposes, the key precedent is *Energy West*, which the parties agreed was binding for purposes of the arbitration, Dkt. 15-11 at 753 n.1, and which, in any event, is controlling in this Court.  In that case, the employer, Energy West, withdrew from a pension plan and the plan's actuary calculated Energy West's withdrawal liability using a discount rate that was untethered to the plan's anticipated performance.  *Energy W.*, 39 F.4th at 734.  The actuary testified at the arbitration "that he did not consider the [p]ension [p]lan's historic investment performance to inform his discount rate assumption," and, instead, "'use[d] a reasonable risk-free interest rate,' which [was] equivalent to assuming the plan would 'buy[] an annuity to settle

up the employer's share of the unfunded vested benefits.'"  *Id.* at 736 (third and fourth alterations in original).  "His justification for using risk-free rates was that when an employer withdraws from a plan, it no longer bears any risk associated with that plan's investment performance."  *Id.*

Energy West unsuccessfully challenged the actuary's choice of a discount rate in an arbitration, and this Court granted summary judgment in favor of the pension plan.  *See generally United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.*, 464 F. Supp. 3d 104 (D.D.C. 2020).  On appeal, the D.C. Circuit disagreed and held that the actuary had failed to abide by the MPPAA's mandate to use "assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan."  *See* 29 U.S.C. § 1393(a)(1).  As the court explained, this statutory text "leaves the actuary with discretion to use his professional judgment about what assumptions are used to calculate withdrawal liability," but "the actuary must make [those] assumptions based on the plan's particular characteristics."  *Energy W.*, 39 F.4th at 737–38.  To hold otherwise, the court continued, would "disregard[] the [statutory] requirement that the actuary estimate the 'anticipated experience *under the plan*.'"  *Id.* at 738 (quoting 29 U.S.C. § 1393(a)(1)) (emphasis added).  If the plan had "invested in risk-free assets," or "if it planned to invest the withdrawal liability payments in risk-free assets," the "risk-free rates might [have been] appropriate."  *Id.* "But if [a] plan [was] currently and project[ed] to be invested in riskier assets, the discount rate used to calculate withdrawal liability [had to] reflect that fact."  *Id.*

Having rejected the actuary's use of a risk-free interest rate on the ground that the assumption was not "based on the plan's actual investments," *id.* at 740, or "anticipated investment experience," *id.* at 738, the *Energy West* court went on to provide guidance regarding

the post-vacatur recalculation of Energy West's withdrawal liability, *id.* at 741–43. Two aspects of that guidance bear on this case:

*First*, the court opined that an actuary need not specify a single "best" estimate of anticipated fund experience and may, instead, specify "a reasonable range," *id.* at 739–40, 742, although that range "cannot be divorced from the plan's anticipated investment returns," *id.* at 740. For support, the court cited precedent from the Second, Fifth, Sixth, and Ninth Circuits, and it quoted with approval the Fifth Circuit's observation that "if the Best Estimate Requirement forced actuaries to use the single most accurate estimation for each assumption, the requirement that the assumptions be reasonable would be 'superfluous.'" *Id.* at 742 (quoting *Vinson & Elkins v. Comm'r*, 7 F.3d 1235, 1238 (5th Cir. 1993)); *see also id.* at 739. The court also (twice) quoted with approval the Second Circuit's observation that the MPPAA "is not violated when an actuary chooses an assumption that is within the range of reasonable assumptions, even when the assumption is at the conservative end of that range, provided the chosen assumption is the actuary's best estimate of anticipated plan experience." *Id.* (emphasis removed) (quoting *Wachtell, Lipton, Rosen & Katz v. Comm'r*, 26 F.3d 291, 296 (2d Cir. 1994) ("*Wachtell*")).

The court's conclusion that an actuary may use a reasonable range is also consistent with the statutory text, which "presume[s]" that the actuary's determination of unfunded vested benefits is "correct" unless his assumptions are "unreasonable" or divorced from the plan's anticipated returns, 29 U.S.C. § 1401(a)(3)(B), and with Supreme Court precedent, which recognizes that this process of predicting future fund performance is an inherently inexact endeavor, *see Concrete Pipe*, 508 U.S. at 635–36. To be sure, an actuary's "predictions about the future," *M & K Emp. Sols.*, 146 S. Ct. at 1228, must be based on the "particular characteristics" of the pension plan, including anticipated investments, liabilities, and

39

performance, *Energy W.*, 39 F.4th at 738. But a prediction is just prediction, and no actuary has a crystal ball. The notion that an actuary can—and must—divine a single, precise number that anticipates future fund performance brings to mind Aristotle's admonition that "it is the mark of an educated man to look for precision in each class of things just so far as the nature of the subject admits." Aristotle, *Nicomachean Ethics* at 1094a24–26 (W.D. Ross trans.).

*Second*, *Energy West* held that the discount rates used to calculate an employer's withdrawal liability and to satisfy the minimum funding requirement need not "be the same." 39 F.4th at 741. As the court explained, the statutory text governing the "actuarial assumptions used to calculate a plan's minimum funding obligations and an employer's withdrawal liability" were "identical" at the time the MPPAA was enacted. *Id.* In 2006, however, Congress amended "the rule for calculating minimum funding obligations, but [it] left the language regarding withdrawal liability assumptions unchanged." *Id.* In their current form, "[b]oth provisions require using assumptions that reflect 'the actuary's best estimate of anticipated experience under the plan.'" *Id.* at 742 (quoting 29 U.S.C. §§ 1393(a)(1), 1084(c)(3)(B)). Because both rules require actuaries to estimate "the same thing"—that is, anticipated performance "based on the actual characteristics of the plan"—the estimates "will invariably be similar." *Id.* "It is difficult, for example, to imagine [that] they could diverge by nearly five hundred basis points[,] as they did" in *Energy West*. *Id.* "Nothing in the statutory text," however, "indicates [that] the assumptions for minimum funding and withdrawal liability must fall at the same point in the acceptable range of estimates based on the plan's characteristics." *Id.*

**b.**

Here, Electrolux argues that the 6.0% discount rate that Kalwarski used to calculate the company's withdrawal liability ran afoul of the MPPAA, *Energy West*, and other relevant

precedent because, on Electrolux's telling, Kalwarski started with the 7.5% funding rate, which represented his "single best prediction of anticipated plan experience," and he then applied a "post-estimate penalty on" Electrolux, as a "withdrawing employer[]".  Dkt. 18 at 16.  The Court agrees that, if Kalwarski had, in fact, done so, the 6.0% withdrawal liability discount rate would violate the MPPAA; it would not constitute the actuary's "best estimate" of the plan's actual, anticipated investment returns.  *See* 29 U.S.C. § 1393(a)(1); *Energy W.*, 39 F.4th at 399.  But as the arbitrator found, and as the record supports, Kalwarski never developed "a single best estimate of anticipated investment performance" but, instead, arrived at a "best estimate range." Dkt. 15-11 at 768.  That range, in turn, was developed based on the plan's specific characteristics.  *Id.*

To be sure, Kalwarski applied what he referred to as a "risk premium" of between 100 to 150 basis points to the discount rate used to calculate the Fund's minimum funding requirements. *Id.* at 554–55.  But, as the arbitrator also found, he based that adjustment on his best judgment regarding the anticipated performance of the Fund.  As she found, Kalwarski considered factors such "as anticipated uncollectible withdrawal liability, bankruptcies, and the plan's underfunding."[3]  *Id.* at 768.  Electrolux disputes this finding and argues that "Kalwarski admitted that he could not recall taking the risk of bankruptcies into account in developing the risk premium," that "Kalwarski actually asserted that '[ERISA's 20-year cap] [did not] pose a risk' for any significant employer," and that "[t]he record evidence . . . clearly shows that the decision

---

[3] In a footnote in its Opposition and Reply Brief, Electrolux argues that "the factors that the Arbitrator said Kalwarski had considered could not be lawfully considered for this purpose, because ERISA requires those risks to be accounted for in a different manner."  Dkt. 18 at 24 n.6.  "Making a cursory argument in a footnote" in a reply brief "does not suffice to" preserve the argument, *Martin v. FBI*, 145 F.4th 1345, 1353 (D.C. Cir. 2025), particular where, as here, the argument does not track a claim raised in the operative complaint, *see generally* Dkt. 1 (Compl.).

to create an initial 100-basis-point risk premium was not the result of actuarial judgment." Dkt. 18 at 24. The record, however, shows otherwise: Kalwarski testified that although "uncollectible withdrawal liability" was not "a significant concern," "[i]t was somewhat [of] a concern," because "many of [his] fund's employers that [had] withdr[awn] . . . ultimately [went] bankrupt." Dkt. 15-11 at 571. And although Kalwarski could not "recall" whether he had "looked at historical bankruptcy," *id.*, he clearly testified that he considered bankruptcies in developing the "risk premium," *id.*; *see also id.* at 576.

Electrolux's suggestion that ERISA's 20-year cap played no role in Kalwarski's consideration of the "risk premium" is equally flawed. As noted above, a withdrawing employer is not required to pay its withdrawal liability assessment in a lump sum but, rather, may amortize the amount due over time. When the amortization period exceeds 20 years, however, liability is "limited to the first 20 annual payments." 29 U.S.C. § 1399(c)(1)(B). As a result, the remaining employers may be left holding the bag. When asked whether this prospect factored into his determination of the "risk premium," Kalwarski acknowledged that the 20-year cap did not "pose a risk" with respect to the Fund's "20 largest employers." Dkt. 15-11 at 571. But he further explained that the cap "still [posed] a risk with the smaller employers" and that, although Cheiron "never quantified" the dollar impact, the Fund had "a thousand contracts in [the] plan, so there[] [were] quite a few smaller employers." *Id.* When counsel for Electrolux pressed Kalwarski to concede that "the issue of bankrupt employers and the issue of the 20-year cap and more generally [sic] inability of withdrawing employers to pay in full . . . was not a significant consideration," Kalwarski pushed back, asserting: "It definitely was a consideration that we should have a risk premium, because the odds are that some of that would happen," even if Cheiron did not (and was not able to) quantify the dollar impact. *Id.*

42

Finally, the arbitrator also pointed to the "[P]lan's underfunding" as a basis for Kalwarski's judgment that a "risk premium" was appropriate. *Id.* at 768. That finding is also supported by the record. Mietlicki and Kalwarski both testified that by 2017 the Plan had unfunded vested benefits and that the Plan "might enter into a critical status or endangered status as well." *Id.* at 521; *see also id.* at 551. When asked why Cheiron nonetheless left the "investment return assumption for th[e] [P]lan" at 7.5% in 2018, 2019, and 2020, Kalwarski explained that Cheiron was "preparing the [F]und to make . . . changes" and that it "recognized that the 7-1/2 percent [investment return assumption] needed to come down." *Id.* But he also explained that, even though Cheiron was "telling the [T]rustees [that it was] going to be moving this thing down," Kalwarski did not see a need to move with any urgency. *Id.* Before making that adjustment, he explained, Cheiron and the Fund had "to establish the rehabilitation plan" to address the shortfall, *id.*; *see also* 29 U.S.C. § 1085(a)(2) (addressing rehabilitation plans), and in 2018 and 2019, "99 percent of [the actuaries'] effort[s]" were focused on developing a "rehabilitation plan . . . that increased contributions and cut benefits," Dkt. 15-11 at 551. Before completing that task, Cheiron "did not want to start changing the [funding] discount rate" for two reasons. *Id.* First, "changing [it] from 7-1/2 to, say, 7-1/4 was going to change the rehab plan," and "it was sort of a circular problem that [they] were facing." *Id.* Second, "the [Plan's] investment consultant . . . was asked by the [T]rustees" to "[c]ome back . . . with portfolios at 7-1/4, 7 percent, 6.75 and 6-1/2," which the Trustees were then "going to examine" to decide whether and how "to make an asset allocation change," and Cheiron "wanted to wait until we saw what that decision was." *Id.* Consistent with this testimony, the Plan eventually lowered its funding discount rate to 7.25% in 2021 and to 6.85% in 2022. *Id.* at 552.

43

It was against this backdrop—including Cheiron's assessment that "changes" had to be made and that the investment return assumption "needed to come down," *id.* at 551—that Kalwarski accounted for the "Plan's underfunding" in selecting a withdrawal liability discount rate that was near, but not at, the low end of his best-estimate range, *id.* at 768. As Kalwarski explained, the "risk premium"—that is, the difference between the funding rate and the withdrawal rate—reflected, along with other things, the fact that withdrawing employers, unlike the employers that continue to participate in the Plan, would not be available to "make . . . up" the shortfall. *Id*. at 563. Notably, this was not based on a policy-laden determination about risk shifting; it was based on Cheiron's professional judgment that a shortfall existed, that changes would need to be made, and that it was acceptable to postpone adjustments to the funding rate (as opposed to the withdrawal rate) pending completion of the rehabilitation plan because the remaining employers would remain on the hook to make up for the anticipated shortfall with future contributions.

In describing why Cheiron lowered the withdrawal liability discount rate to 6.0% in December 2018, even though the funding rate remained at 7.5%, Kalwarski makes this point even more clearly. He explained that in an environment in which the actuary knows that the funding rate is going to come down "in the coming years," the employers who remain in the plan can "make up" the difference in future years, "[b]ut for . . . withdrawn employer[s], once they're out, that subsequent lower discount rate" would not apply to them. [4] *Id.* at 572–73; *see also id.* at 325 (Franklin expert report making the same point). In this respect, Kalwarski's best estimate of

---

[4] Although the transcript reports that Kalwarski testified that "the employers remaining in the fund wouldn't make up any difference," Dkt. 15-11 at 572, it appears that this is a mistranscription or that Kalwarski misspoke. Either way, it is clear from context that Kalwarski was contrasting the remaining employers, who could make up any difference, with "a withdrawn employer," who would not be subject to "that subsequent lower discount rate." *Id.* at 572-73.

actual Fund performance, as applied to withdrawing employers, had to account for his understanding that the Plan was underfunded and that changes had to be made in the coming years.

Electrolux places much weight on the fact that Kalwarski started with the minimum funding requirement discount rate and deducted the "risk premium" from that amount. The company asserts that "the only way to understand what Kalwarski did is that he treated the 7.5% 'discount rate' as the expected return, and used the risk premium to adjust for possible deviation" and that "[t]he size of the premium was not driven by any assessment of how likely the Fund's assets were to return any specific lower figure, but instead on a trustee compromise on the policy question of how much 'protection' would be 'given to on-going employers.'" Dkt. 18 at 22 (citing Dkt. 15-17 at 687). But as the above discussion illustrates, that is not what the arbitrator found actually happened. Instead, as *Energy West* allows, Kalwarski developed a best-estimate range "based on the plan's characteristics," 39 F.4th at 742, and he selected a withdrawal liability discount rate at the "conservative end of that range" based on "the plan's actual investments" and anticipated funding requirements, *id.* at 739–40.

It bears emphasis that the concept of a "risk premium" is a two-way street; there is no difference characterizing the funding rate as 100 or 150 basis points above the withdrawal funding rate or characterizing the withdrawal funding rate as 100 or 150 basis points below the funding rate. And given Kalwarski's testimony regarding uncollectible withdrawal liabilities, bankruptcies, and underfunding, *see* Dkt. 15-11 at 571, it is a mistake to treat the minimum funding discount rate as the fixed star from which a premium was deducted to insulate the remaining employers from any risk arising from the withdrawals. Indeed, one might just as easily argue that the funding discount rate was inflated above the withdrawal discount rate for

45

various reasons, including the fact that Cheiron deferred reducing that rate while it developed the rehabilitation plan and while the Plan's investment consultants and Trustees decided whether and how to reallocate the portfolio, and including the need to adjust for bankruptcies and the 20-year cap. *See* Dkt. 15-11 at 551. But most fundamentally, Electrolux resists *Energy West*'s recognition that "[t]he [b]est [e]stimate [r]equirement does not mandate adopting any single numerical assumption," rather than "an 'acceptable 'range,'" and that "the assumptions for minimum funding and withdrawal liability" need not "fall at the same point in the acceptable range of estimates based on the plan's characteristics." 39 F.4th at 742 (quoting *Citrus Valley Est., Inc. v. C.I.R.*, 49 F.3d 1410, 1415 (9th Cir. 1995)). As Electrolux recognizes, this Court is of course bound to follow *Energy West*. *See* Dkt. 16-1 at 33 n.5.

For similar reasons, Electrolux's reliance on the Second Circuit's decision in *Wachtell* is unavailing. In that case, the Internal Revenue Service argued that the actuarial assumptions used by the law firm to calculate its contributions to an individual defined benefit plan were unreasonable "and did not represent the actuary's best estimate of anticipated plan experience" because, among other things, "the basic tenet of actuarial conservatism" was at odds with the statutory mandate to use the "actuary's best estimate of anticipated experience under the plan." *Wachtell*, 26 F.3d at 294–95 (quoting 26 U.S.C. § 412(c)(3)). In a sentence that Electrolux highlights, the *Wachtell* court agreed "with the Commissioner that factoring in a discount for conservatism after an actuary has arrived at his or her best estimate of anticipated experience would be contrary to the statutory mandate." *Id.* at 296. But the Second Circuit went on to reject the premise "that the Tax Court either endorsed this practice or found that the assumptions [used in that case] were improperly discounted." *Id.* As the court explained:

> Our understanding is that the [tax] court merely determined that, generally, § 412(c) is not violated when an actuary chooses an assumption that is within

46

the range of reasonable assumptions, even when the assumption is at the conservative end of that range, provided the chosen assumption is the actuary's best estimate of anticipated plan experience . . . .  In our view, this determination was not erroneous as a matter of law.

*Id.* (citation modified).

That is precisely what happened here, and, thus, if anything, the *Wachtell* decision supports the Plan's position.  As the arbitrator found in this case, the actuary "developed what he termed a 'best estimate range' rather than a single best estimate of anticipated investment performance," and he then "selected a [withdrawal liability discount] rate that was within that range."  Dkt. 15-11 at 768.  The expert testimony offered at the arbitration, moreover, confirmed that Kalwarski's best-estimate range represented a reasonable assessment of "investment outcomes using data that would have been available to Mr. Kalwarski at the times he selected his discount rate assumptions."  *Id.* at 768–69.  Despite Electrolux's assertions to the contrary, Kalwarski did not select a single best estimate and then deduct a premium to transfer any uncertainty regarding future performance from the remaining employers to the withdrawing employers.  To the contrary, as in *Wachtell*, the discount rate that Kalwarski selected "was on the conservative end of [a] range of reasonable assumptions about the Fund's projected experience."  *Id*. at 769.  That is all that *Wachtell*—or the MPPAA—requires.

The Court acknowledges that the record before the arbitrator was ambiguous on this point and that at least portions of the record might be read as suggesting that Kalwarski elected to include a 100 basis point risk premium for reasons of fund management policy, such as balancing the need to protect remaining employers against the need to preserve the fund's attractiveness to new employers or to shift risk among remaining and withdrawing employers in a manner that Kalwarski thought made sense as a matter of general practice.  *See, e.g.*, *id.* at 570 (Kalwarski referencing "offsetting" risks such as the risk of "dry[ing] up the ability of new

47

employers to join the fund"); *id.* at 563 (Kalwarski describing the risk premium's purpose of guarding against "contributing employers . . . who are still contributing" having to "make . . . up" for investment underperformances that a withdrawing employer would avoid).  If the Court determined that that was in fact Kalwarski's method, it would raise the novel legal question whether *Energy West* permits an actuary to select a withdrawal liability discount rate that is within the actuary's "acceptable range of estimates based on the plan's characteristics," 39 F. 4th at 742, but that is placed at or near the low end of that range based on factors that are not tied to the specific "anticipated experience" of the individual plan, such as the actuary's general views concerning attracting new employers or about allocating risks among remaining and withdrawing employers.  In other words, does the actuary's best-estimate range provide a safe harbor in which the actuary has a measure of discretion to consider risk allocation and other non-performance related factors?  Here, however, the Court need not confront this difficult question of law.  In the present case, and unlike in the scenario posited above, the arbitrator found that the actuary's selection of the risk premium near the low end of his best-estimate range was, in fact, "plan-specific" based on "factors [such] as anticipated uncollectible withdrawal liability, bankruptcies, and the plan's underfunding."  Dkt. 15-11 at 768.  As explained above, that determination finds support in the record and was not clearly erroneous.

Ultimately, the MPPAA requires the fund actuary to determine the "fair share" of the withdrawing employer's unfunded liabilities, *see R.A. Gray & Co.*, 467 U.S. at 723 n.3 (1984) (quoting *Pension Plan Termination Insurance Issues: Hearings before the Subcomm. on Oversight of the House Comm. on Ways and Means*, 95th Cong., 2d Sess., 23 (1978) (statement of Matthew M. Lind)); *Connolly*, 475 U.S. at  216–17 (1986) (quoting same); *Bd. of Trs., Michigan United Food and Commercial Workers Union v Eberhard Foods, Inc.*, 831 F.2d 1258,

1259 (6th Cir. 1987); *Ace-Saginaw Paving Co. v. Operating Eng'rs Local 324 Pension Fund*,

150 F.4th 502, 513 (6th Cir. 2025), based on "the actuary's best estimate of anticipated

experience," *Sofco Erectors, Inc*., 15 F.4th at 421 (citation modified).  An actuary may not make

policy decisions (such as seeking to discourage additional employers from withdrawing by

artificially inflating the cost of doing so) or engage in unvarnished risk reallocation that is

"'divorced from' a plan's anticipated returns" or expected performance.  *Clark County I*, 664 F.

Supp. 3d at 41 (quoting *Energy W.*, 39 F.4th at 740).  But there is no reason why an actuary

cannot—and should not—factor in an element of "conservativ[ism]" in arriving at his "best

estimate" of anticipated performance, *Energy W.*, 39 F.4th at 739 (citation modified); *see also*

*Clark County I*, 664 F. Supp. 3d at 41, particularly where, as here, there is reason to believe that

the plan "might enter into a critical status or endangered status as well," Dkt. 15-11 at 521; *see*

*also id*. at 551.

Here, the arbitrator reasonably found that Kalwarski engaged in precisely this type of

plan-specific assessment of anticipated performance and, in particular, what discount rate would

ensure that withdrawing employers pay their fair share of unfunded vested benefits.  She

committed neither legal nor factual error.

**C.      Similarity Between Minimum Funding and Withdrawal Liability Discount Rates**

Finally, Electrolux argues that "the rate that the Fund used to calculate [its] withdrawal

liability violated the third constraint outlined" in *Energy West*, because "the discount rates for

withdrawal liability and minimum funding" were not sufficiently "similar."  Dkt. 16-1 at 32.  As

explained above, *Energy West* held that these discount rates "need not be identical," but they

"must be similar because they both must [represent] 'the actuary's best estimate of anticipated

experience under the plan,'" and they are "estimates of the same thing."  39 F.4th at 741–42.  By

way of example, the *Energy West* court observed that it would be "difficult . . . to imagine" that

the rates "could diverge by nearly five hundred basis points, as they did" in *Energy West*. *Id.* at 742. In Electrolux's view, the similarity requirement "serves as an important protection against bias in favor of the remaining employers." Dkt. 16-1 at 32.

Here, Electrolux argues that the rates at issue "resulted in estimates nearly as far apart as in *Energy West*." *Id.* at 34. In *Energy West*, "the actuary's use of risk-free rates increased the employer's liability by about 2.9 times relative to the funding rate," while in this case, "Kalwarski's subtraction of [100 or 150 basis points from the discount rate] increased Electrolux's liability by about 2.5 times relative to the funding rate." *Id.* (citation modified). According to Electrolux's expert witness, using an assumed 7.5% rate of return, rather than the 6.0% rate Cheiron used, and using an "administrative load" of 3.4%, rather than the 3.6% that Cheiron used, would have resulted in overall unfunded vested benefits of approximately $1.9 billion, rather than the $4.9 billion in overall unfunded vested benefits that Cheiron measured. Dkt. 15-11 at 356–57. Electrolux contends that had Cheiron applied the 7.5% discount rate in calculating its withdrawal liability, its liability (payable over 60 quarters) would have dropped from approximately $32 million, *id.* at 506 (Joint Stipulation ¶ 3), to about $13 million, *id.* at 759, a factor of more than two.

As an initial matter, the Court notes that the comparison that Electrolux draws—contrasting the 7.5% minimum funding discount rate with the 6.0% withdrawal liability discount rate—overstates the actual difference for the reasons explained above. By 2022, Cheiron had dropped the minimum funding discount rate to 6.85%, and the actuaries had "communicated to the [T]rustees that [they] [would] be dropping . . . the discount rate" long before they did so. Dkt. 15-11 at 552. The fact that the reduction in the funding rate lagged behind the withdrawal

50

rate for reasons unrelated to their best estimate of anticipated fund performance does not support Electrolux's claim of undue disparity.

Electrolux's argument, however, suffers from a more significant defect:  The company focuses on the differences in overall unfunded vested benefits and corresponding withdrawal liability, while *Energy West* focuses on differences in "the assumptions" used to calculate those amounts, including most notably the discount rates.  39 F.4th at 741.  As *Energy West* explains:

> Because the *discount rate assumptions* for calculating withdrawal liability and minimum funding must be estimates of the same thing, they will invariably be similar.  It is difficult, for example, to imagine they could diverge by nearly *five hundred basis points*, as they did here.

*Id.* at 742 (emphasis added).  That focus mirrors the statutory text, which requires the actuary to use "assumptions and methods which, in the aggregate, are reasonable," 29 U.S.C. § 1393(a)(1), and is consistent with the Supreme Court's admonition that courts should consider the reasonableness of the actuary's "methods and assumptions," rather than "the accuracy of a predictive calculation," *Concrete Pipe*, 508 U.S. at 635.

Here, the difference in discount rate assumptions was far less—perhaps as high as 150 basis points if based on a fixed moment in time or as low as 85 basis points if based on the different pace at which Cheiron changed the rates.  *See* Dkt. 15-11 at 670.  As the arbitrator found, "Electrolux failed to establish that the withdrawal liability discount rate selected by the actuary . . . [was] not 'similar' to the funding rate."  *Id.* at 772.  Although Electrolux is correct that small differences in the discount rate can have substantial effects, Dkt. 16-1 at 35, that does not mean that the *Energy West* court erred in holding that "the assumptions need not be identical," 39 F.4th at 741, or that discount rates that fall within an actuary's best-estimate range, that are based on reasonable actuarial practices, and that differ by only 150 or 85 basis points, are inherently suspect.  Ultimately, it is difficult to perceive substantial daylight between

51

Electrolux's contention that the difference in this case was too great and its separate contention that "the two rates must . . . be identical."  Dkt. 16-1 at 33 n.5.  The first argument fails on the ground that the difference in this case was modest, and, as Electrolux itself acknowledges, its second argument is foreclosed by binding D.C. Circuit precedent.  *Id.*

* * *

The Court, accordingly, concludes that the arbitrator's decision withstands both factual and legal challenge.  Her factual findings are reasonable and well-supported by the record; she accurately stated the governing law; and she correctly applied the law to her factual findings.  It follows that Electrolux has failed to carry its burden in seeking vacatur of the arbitral award and that the Plan is entitled to an order confirming that award.

### CONCLUSION

For the foregoing reasons, the Court will **DENY** Electrolux's motion for summary judgment, *see* Dkt. 16, will **GRANT** the Plan's cross-motion for summary judgment, *see* Dkt. 19, and will **CONFIRM** the arbitral award.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 8, 2026

52